Adam M. Apton (330152020)
LEVI & KORSINSKY, LLP
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIC BARTA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NOVO NORDISK A/S, MAZIAR MIKE DOUSTDAR, LARS FRUERGAARD JØRGENSEN, KARSTEN MUNK KNUDSEN, AND DAVID S. MOORE<br><br>Defendants. | Civ. No. 25-14045 (ZNQ)(JBD)<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

## Table of Contents

I.  NATURE OF THE ACTION ...........................................................................2

II.  JURISDICTION AND VENUE....................................................................5

III.  PARTIES ......................................................................................................6

    A.  Plaintiffs ...........................................................................................6

    B.  Defendants.........................................................................................7

IV.  SUBSTANTIVE ALLEGATIONS ..............................................................9

    A.  Novo Develops, Manufactures, and Distributes Semaglutide, its Primary Drug Product, to Combat Obesity and Diabetes .....................9

    B.  As Weight Loss Drugs Gain Popularity, they Quickly Balloon into a Multi-Billion Dollar Market and Attract the Attention of Compounding Pharmacies...................................................................11

        a.  Compounding Exemptions Under Section 503A of the FD&C Act .................................................................................13

        b.  Compounding Exemptions Under Section 503B of the FD&C Act .................................................................................17

    C.  In 2022, Massive Demand for Semaglutide Causes the FDA to Place Wegovy and Ozempic on the Drug Shortage List, Enabling Pharmacies to Mass Produce Compounded Semaglutide and Capture a Large Share of the Market.................................................................18

    D.  Novo Acquires Manufacturing Facilities in an Effort to Quickly Increase Supply in the U.S. and Remove Semaglutide from the Drug Shortage List.................................................................................20

E.    The FDA Removes Semaglutide from the Shortage List in February 2025, Yet Pharmacies Continue Compounding Semaglutide Under the Personalization Exemption, Preventing Novo from Reclaiming Market Share ..................................................................................22

F.    Defendants Know that, Contrary to Their Public Statements, Compounding Pharmacies Can, and Do, Lawfully Continue to Sell Semaglutide "En Masse" Under the Personalization Exemption, Which Negatively Impacts Novo's Sales and Market Share..............25

G.    Despite Defendants' Efforts to Deter Compounding During the Class Period, the Personalization Exemption Remains a Lawful Avenue for Pharmacies to Produce Compounded Semaglutide Drugs that Directly Compete with Novo's Branded Drugs ................................................31

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ............................................33

A.    False and Misleading Statement in the November 6, 2024 *Reuters* Article ...................................................................................................33

B.    False and Misleading Statements Made During the November 7, 2024 CNBC Interview...........................................................................35

C.    False and Misleading Statements Made During April 29, 2025 ABC News Interview.................................................................................38

D.    False and Misleading Statements Made in the May 7, 2025 Earnings Call ...............................................................................................41

E.    False and Misleading Statements in the May 7, 2025 Investor Presentation ...........................................................................................47

iii

F. False and Misleading Statements Made on May 7, 2025 Bloomberg Podcast Episode.................................................................49

G. False and Misleading Statement in the June 23, 2025 Press Release .52

VI. THE TRUTH EMERGES .........................................................................54

VII. ADDITIONAL SCIENTER ALLEGATIONS ...............................................60

A. Defendants' Private Communications with States' Boards of Pharmacy Create a Strong Inference that They Knew Compounding Pharmacies Intended to, and Could, Lawfully Sell Semaglutide "En Masse" Under the Personalization Exemption....................................60

B. While Publicly Maintaining Compounders Do Not Threaten Novo's Business, Defendants Directed an Effort to Sue More than 100 Compounders Alleging Trademark Infringement to Stop Them from Taking Novo's Business.......................................................................64

C. That the FDA Refused to Take Action to Prohibit Production of Compounded Semaglutide Under the Personalization Exemption Supports a Strong Inference Defendants Knew Compounding Was Harming, and Would Continue to Harm, Novo's Business................66

D. Defendants' Launch of NovoCare, a Pharmacy to Compete with the Lower Pricing of Compounders, Contributes to the Scienter Inference .......................................................................................................68

E. Defendant Jørgensen's Suspiciously Timed Termination Further Supports a Strong Inference of Scienter...............................................70

F. The Actions of Novo's Agents and Senior Executives Contribute to the Scienter Inference.......................................................................71

iv

G.    GLP-1 Drug Sales Were Novo's Core Operations ..............................73

VIII.  LOSS CAUSATION AND ECONOMIC LOSS ...........................................74

IX.   PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET ..............78

X.    NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION
      DOCTRINE ...................................................................................................80

XI.   CLASS ACTION ALLEGATIONS...............................................................81

XII.  CLAIMS FOR RELIEF..................................................................................84

COUNT I...................................................................................................................84

COUNT II .................................................................................................................88

XIII.  PRAYER FOR RELIEF .................................................................................89

XIV.  DEMAND FOR TRIAL BY JURY ...............................................................90

1.      Court-appointed lead plaintiff Ahmed Hashim ("Lead Plaintiff") and additional plaintiff IAM Motor City Pension Fund (together, the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint for Violations of the Federal Securities Laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Novo Nordisk A/S ("Novo" or the "Company") with the United States Securities and Exchange Commission (the "SEC") and the Danish Financial Supervisory Authority ("DFSA"); (b) review and analysis of Novo's public documents, conference call transcripts, press releases, and ADR chart; (c) review and analysis of media articles, securities analysts' reports and advisories concerning the Company; (d) consultation with an industry expert; (e) review and analysis of documents obtained from state boards of pharmacy through public records requests; and (f) information readily obtainable on the internet.

2.      Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Novo, Lars Fruergaard Jørgensen, Novo's Chief Executive Officer, Karsten Munk Knudsen, Novo's Chief Financial Officer, and David S. Moore, Novo's Executive

1

Vice President of U.S. Operations (collectively, the "Defendants") or are exclusively within their control.

## I.   NATURE OF THE ACTION

3.    This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Novo Nordisk American Depositary Receipts ("ADRs") between November 6, 2024, and July 28, 2025, inclusive (the "Class Period") and were damaged thereby (the "Class"). Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

4.    Novo is a global pharmaceutical powerhouse whose financial success relies heavily on its glucagon-like peptide-1 ("GLP-1") drugs that treat diabetes and obesity, Ozempic and Wegovy, which together accounted for approximately 61.5% and 66.7% of the Company's total revenues in 2024 and 2025, respectively, and approximately 80% of its sales in the United States, the Company's most important market.

5.    This action arises from Defendants' multi-month fraudulent scheme to downplay and misrepresent a massive competitive threat: the rise of compounding pharmacies. In 2022, consumers became increasingly aware of the incredible efficacy of Ozempic and Wegovy in treating obesity, which created overwhelming demand for semaglutide (the active pharmaceutical ingredient ("API") in Ozempic

2

and Wegovy). At that time, Novo was unable to meet the ballooning demand, causing the U.S. Food and Drug Administration ("FDA") to place these drugs on the official drug shortage list. Under Sections 503A and 503B of the Federal Food, Drug & Cosmetic Act ("FD&C Act"), this shortage legally authorized compounding pharmacies to manufacture and sell copies of Novo's semaglutide drugs to meet demand. By late 2024, compounding pharmacies had seized an estimated $1 billion in market share, fulfilling 20% of all Wegovy-equivalent prescriptions in the U.S. at a fraction of Novo's $1,349 monthly list price.

6.    Throughout the Class Period, Defendants Jørgensen, Knudsen, and Moore engaged in a concerted effort to assure the market that this competition in the U.S. was either non-existent or temporary. In November 2024, Defendant Jørgensen told *Reuters* that compounding was "not something that's impacting our business" and told CNBC that compounders were not a "real threat." After the FDA removed semaglutide from the shortage list in February 2025, Defendants pivoted their messaging to continue the fraud: they repeatedly claimed that compounding was now "illegal except for rare circumstances" and would "wind down" entirely by May 22, 2025. Based on the false premise that Novo would reclaim 1 million patients, Defendants issued aggressive 2025 sales growth projections of 13-21%.

7.    Defendants' statements were materially false and misleading. Defendants knew that while the shortage-based exemption was ending,

3

compounding pharmacies were lawfully transitioning to a business model wherein they could mass-compound semaglutide under the "personalization exemption" of Section 503A. This exemption allows pharmacies to compound semaglutide so long as it includes patient-specific changes (such as the addition of vitamin B-6 or a change in delivery mechanism).

8.     While publicly dismissing the personalization exemption as "rare" and therefore not something for investors to be concerned about, Novo was internally panicking. Evidence of Defendants' scienter is overwhelming:

**Internal Admissions to Regulators:** While telling investors compounding was "illegal," Defendants authorized Novo's senior executives (including Robert Clark, Vice President of Regulatory Affairs) to write letters to many (if not all) states' boards of pharmacy. In these letters, Novo admitted that compounders intended to continue selling semaglutide "en masse" under the "pretext of personalization" and implored regulators to intervene because the FDA Guidance (defined below) actually permitted this practice.

**Unprecedented Litigation:** While claiming "we don't see [compounders] as a real threat" Novo launched a massive campaign of over 100 lawsuits against compounding pharmacies to stop them from siphoning Novo's sales—an admission of the very impact they denied to shareholders.

**Regulatory Desperation:** Novo filed a citizen petition with the FDA to add semaglutide to the "Demonstrably Difficult to Compound" list—a move that would only be necessary if the Section 503A personalization exemption was a viable, legal threat to their business.

**Executive Accountability:** The suspiciously timed termination/departure of CEO Jørgensen, announced just as the fraud was fully revealed, further supports a strong inference that the Company's top leadership was responsible for the deceptive narrative.

4

9. The truth finally emerged on July 29, 2025, when Novo was forced to admit that its prior guidance lacked a reasonable basis. The Company slashed its 2025 sales growth outlook from 13-21% to 8-14% and admitted that the "persistent use of compounded GLP-1s" had not diminished and was expected to continue. Most tellingly, Defendants revealed that the number of users on compounded semaglutide remained at approximately 1 million, meaning the "wind down" Defendants promised would occur by May 2025 had never happened.

10. The market reaction was immediate. On July 29, 2025, the price of Novo ADRs plummeted by $15.06 per share, or 21.83%, on massive trading volume. This crash erased billions of dollars in market capitalization, causing severe economic loss to Plaintiffs and the Class who had purchased Novo ADRs at prices artificially inflated by Defendants' misrepresentations.

## II.  JURISDICTION AND VENUE

11. The claims asserted herein arise under and are pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Novo's U.S. headquarters is located in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class took place within this District.

14. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## III.    PARTIES

### A.  Plaintiffs

15. Lead Plaintiff Ahmed Hashim purchased Novo ADRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Hashim's purchases of Novo ADRs are set forth in the certification filed herewith.

16. Additional plaintiff IAM Motor City Pension Fund purchased Novo ADRs at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. IAM Motor City Pension Fund's purchases of Novo ADRs are set forth in the certification filed herewith.

6

**B. Defendants**

17.    Defendant Novo Nordisk A/S is a Danish corporation with its United States principal executive offices located at 800 Scudders Mill Road, Plainsboro, NJ 08536. During the Class Period, the Company's ADRs traded on the New York Stock Exchange ("NYSE") under the symbol NVO.

18.    Defendant Lars Fruergaard Jørgensen ("Jørgensen") was, at all relevant times, the President, Chief Executive Officer, and a Member of the Management Board of Novo. On July 29, 2025, Novo announced Jørgensen would "step down" from his roles on August 7, 2025.

19.    Defendant Karsten Munk Knudsen ("Knudsen") was, at all relevant times, the Executive Vice President, Chief Financial Officer, and a Member of the Management Board of Novo.

20.    Defendant David S. Moore ("Moore") was, at all relevant times, the Executive Vice President of U.S. Operations and a Member of the Management Board of Novo.

21.    Defendants Jørgensen, Knudsen, and Moore are sometimes referred to herein as the "Individual Defendants." Novo and the Individual Defendants, together, are referred to herein as the "Defendants."

22.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Novo's

7

reports to the SEC and DFSA, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports, public statements, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23.    Novo is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Novo under respondeat superior and agency principles.

8

## IV.    SUBSTANTIVE ALLEGATIONS

### A.  Novo Develops, Manufactures, and Distributes Semaglutide, its Primary Drug Product, to Combat Obesity and Diabetes

25.    Headquartered in Denmark and founded in 1923, Novo is a pharmaceutical company whose primary business is the research, development, manufacturing, distribution, and sale of pharmaceutical products.

26.    Novo reports its revenues in two segments: the "Diabetes and Obesity care" segment and the "Rare Disease" segment. In 2024 and 2025, the Diabetes and Obesity care segment accounted for approximately 93.6% and 93.7% of the Company's revenues, respectively, while the Rare Disease segment accounted for only 6.4% and 6.3% of revenues during those same years.

27.    Novo also reports its sales by geographic market. Novo's biggest and most important geographic market segment is the United States. In 2024 and 2025, the United States market accounted for 57.64% and 56.03% of Novo's total sales, respectively.

28.    Over the past decade, Novo has become a leader in the development and sale of GLP-1 drugs that are used to manage diabetes and obesity. Novo's GLP-1 drugs include, among others,[1] Ozempic for the treatment of diabetes, and Wegovy for the treatment of obesity.

---

[1] Novo's other GLP-1-based drugs include Saxenda (liraglutide), Victoza (liraglutide) and Rybelsus (oral semaglutide).

9

29.    Ozempic was approved by the FDA on December 5, 2017 for the treatment of adults with type 2 diabetes to improve glycemic control. Ozempic is administered once per week by injection. Although Ozempic is not FDA-approved as a weight loss drug, healthcare providers frequently prescribe it for this off-label purpose.

30.    Wegovy was specifically developed and studied for chronic weight management. The FDA first approved Wegovy on June 4, 2021 as an adjunct to diet and exercise for adults with obesity or who are overweight with at least one weight-related comorbidity. The injectable form of Wegovy is administered once per week. In late 2025, the FDA approved an oral tablet version of Wegovy.

31.    The active ingredient in both Wegovy and Ozempic is semaglutide, a molecule that acts as a GLP-1 receptor agonist. While the FDA has never approved the semaglutide molecule as a standalone drug, the FDA has approved Novo's specific proprietary formulations, strengths, excipients, manufacturing processes, and delivery devices in the finished, branded drug products Ozempic and Wegovy.

32.    Ozempic and Wegovy are Novo's most important products. Combined, Ozempic and Wegovy sales accounted for 61.5% and 66.7% of Novo's total revenues in 2024 and 2025. Ozempic and Wegovy combined to account for 77.6% and 80.5% of Novo's revenues within the United States geographic market in 2024 and 2025, respectively.

33.    Ozempic and Wegovy were also the most important products in each sub-segment of Novo's business. In 2024 and 2025, Ozempic sales accounted for 58.24% and 61.36% of revenues in Novo's "Diabetes care" sub-segment, surpassing insulin as the Company's most important diabetes care product. In 2024 and 2025, Wegovy sales accounted for 89.35% and 96.06% of the revenues in Novo's "Obesity care" sub-segment.

**B. As Weight Loss Drugs Gain Popularity, they Quickly Balloon into a Multi-Billion Dollar Market and Attract the Attention of Compounding Pharmacies**

34.    Demand for drugs that treat obesity and diabetes has increased significantly over the last several years, especially for GLP-1 receptor agonist drugs like Ozempic and Wegovy.

35.    The rapid increase in demand for weight-loss drugs is rooted in the accelerating epidemics of obesity and type 2 diabetes that have afflicted the United States and the world for decades. Between 2021 and 2023, adult obesity prevalence in the United States stood at approximately 40.3%, affecting more than 100 million adults and representing a near doubling since the late 1990s.

36.    Globally, the crisis is even more pronounced. The World Health Organization reported that adult obesity rates more than doubled between 1990 and 2022, resulting in an estimated 890 million adults living with obesity, or approximately one in every eight people on the planet.

11

37.    Exacerbating the obesity epidemic is the parallel surge in diabetes. In the United States alone, approximately 40.1 million adults (about 12% of the adult population) have diabetes.

38.    Because obesity is the leading modifiable risk factor for type 2 diabetes, the two conditions feed each other in a vicious cycle, generating tens of millions of patients who urgently needed therapies capable of producing meaningful, sustained weight loss and glycemic improvement. This massive, unmet clinical need has propelled GLP-1 drugs like semaglutide from niche diabetes treatments into the fastest-growing therapeutic category in pharmaceutical history.

39.    The dramatic rise in rates of obesity and diabetes, and the massive demand for effective treatment of these conditions, motivated other large pharmaceutical companies to develop their own GLP-1 drugs. For example, Novo's primary competitor, Eli Lilly, developed the tirzepatide molecule and sells several GLP-1 drugs based on that molecule that compete directly with Novo's Ozempic and Wegovy drugs. Eli Lilly's GLP-1 products, named Mounjaro and Zepbound, use biologic mechanisms similar to those of Ozempic and Wegovy to achieve similar clinical results.

40.    In addition to large firms like Eli Lilly, Novo faces competition from compounding pharmacies. Compounding pharmacies include state-licensed facilities that prepare: (1) customized medications when a prescriber determines that

commercially available FDA-approved drugs do not adequately address patient needs, and (2) drugs that are essentially copies of FDA-approved drugs when the FDA has determined that the drug is not commercially available, *i.e.*, when there is a supply shortage that impacts patients' ability to obtain the FDA-approved drug.

41. As a general rule, only manufacturers that (1) hold an approved New Drug Application or Abbreviated New Drug Application; (2) operate in facilities that comply with Current Good Manufacturing Practices; and (3) undergo FDA premarket review can produce and market an FDA-approved drug like Ozempic or Wegovy.

### a. Compounding Exemptions Under Section 503A of the FD&C Act

42. Section 503A (21 U.S.C. §353a) permits state-licensed pharmacies, and licensed pharmacists or physicians, to compound drug products for individual patients on a patient-specific basis.

43. Under Section 503A, compounding pharmacies are exempt from certain requirements that typically apply to drug manufacturers, including the current good manufacturing standards in Section 501(a)(2)(B) of the FD&C Act, the labeling requirements in Section 502(f)(1), and the new drug application and abbreviated new drug application rules of Section 505.

44. Although pharmacies operating under Section 503A are generally prohibited from compounding drug products that are essentially a copy of an FDA-

13

approved drug that is commercially available, Section 503A allows pharmacies to compound drugs that are essentially copies of, or substantially similar to, such drugs under two exemptions: A pharmacy may compound (1) essential copies of a drug if the drug is listed on the FDA's drug shortage list (the "commercial availability exemption"); or (2) a drug that is substantially similar to an FDA-approved drug that is commercially available if there is a change to the drug product, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product (the "personalization exemption").

45.    Importantly, compounding pharmacies operating under Section 503A may compound drugs under the personalization exemption even when a similar FDA-approved drug is commercially available.

46.    Additionally, because a compounded drug product that has a patient-specific change (*i.e.*, is "personalized") is ***not*** an essential copy of a commercially available drug product, the statute's prohibition against compounding regularly or in inordinate amounts, *i.e.*, mass compounding, does not apply:

> For purposes of paragraph (1)(D), the term 'essentially a copy of a commercially available drug product' does not include a drug product in which there is a change, made for an identified individual patient, which produces for that patient a significant difference, as determined by the prescribing practitioner, between the compounded drug and the comparable commercially available drug product.

21 U.S.C. § 353a(b)(2).

14

47.    The FDA published industry guidance in January 2018 regarding compounding under Section 503A (the "FDA Guidance") [2]. In the FDA Guidance, the FDA advises that there is no specific format in which a prescribing physician must note a patient-specific change to a compounded drug product when making a prescription, provided the physician describes the change and the difference it will mean for the patient. The FDA further advises that it does not intend to question prescriber determinations that a change is necessary—it only intends to question whether the purported need for such a change was documented. In practice, the change required for personalization could be a change in dosage, delivery method, or even the addition of vitamins or other supplements for a specific purpose.

48.    The FDA Guidance includes a flow chart titled "Appendix A" that summarizes when a pharmacy operating under Section 503A may compound a drug that is essentially a copy of a commercially available drug or comparable to a commercially available drug. *See* Figure 1, below.

---

[2] U.S. Department of Health and Human Services Food and Drug Administration Center for Drug Evaluation and Research (CDER) Office of Compliance / OUDLC, *Compounded Drug Products That Are Essentially Copies of a Commercially Available Drug Product Under Section 503A of the Federal Food, Drug, and Cosmetic Act: Guidance for Industry*, January 2018, https://www.fda.gov/media/98973/download, last accessed March 30, 2026.

15

**Figure 1.**



49.     In short, Section 503A permits a pharmacy to compound a drug product that is similar to a commercially available, FDA-approved drug if a prescriber identifies a change in the drug that will have a significant medical difference for the patient, so long as the pharmacy receives prescriptions detailing the change to be made to the drug product and a description of the clinical need for the change.

### b. Compounding Exemptions Under Section 503B of the FD&C Act

50.     Section 503B (21 U.S.C. §353b), added to the FD&C Act in 2013, created a new category of compounders called "outsourcing facilities."

51.     Under Section 503B, a pharmacy that registers with the FDA as an outsourcing facility is exempted from complying with Sections 352(f)(1), 355, and 360eee-1 of the FD&C Act, provided that the outsourcing facility complies with all the relevant statutory rules and regulations in Section 503B.

52.     Similar to one of the exemptions in Section 503A, Section 503B permits outsourcing facilities to compound drugs that are essentially copies of FDA-approved drugs, but only if those drugs appear on the FDA's current drug shortage list. This exemption is intended to ensure that patients can receive treatment even when their FDA-approved, branded medication is largely unavailable due to supply constraints.

53.     Unlike Section 503A compounders, pharmacies that register under 503B are not required to limit production to prescriptions for identified individual patients. Under Section 503B, registered outsourcing facilities may prepare large quantities of compounded products in advance of receiving specific orders and untethered from specific patient prescriptions, enabling outsourcing facilities to supply hospitals, clinics, 503A pharmacies, and healthcare providers with ready-to-use medications for office stock or general distribution.

17

**C. In 2022, Massive Demand for Semaglutide Causes the FDA to Place Wegovy and Ozempic on the Drug Shortage List, Enabling Pharmacies to Mass Produce Compounded Semaglutide and Capture a Large Share of the Market**

54.     Soon after the FDA approved Novo's Wegovy for the treatment of obesity in 2021, demand for the drug exploded. Some sources estimate that prescriptions for all GLP-1 drugs rose 587% between 2019 and 2024. Demand for Wegovy in 2021 was so great that Novo was unable to manufacture enough doses of the drug to meet market demand.

55.     As a result, in March 2022, the FDA added Wegovy to its official drug shortage database, also known as the drug shortage list.

56.     The shortage of Wegovy led health care providers to prescribe Ozempic as an off-label treatment for weight loss, likewise resulting in a shortage of Ozempic and causing the FDA to add Ozempic to the drug shortage list in August 2022.

57.     The addition of Wegovy and Ozempic to the FDA's drug shortage list opened the floodgates for compounding pharmacies to make their own copies of those drugs and compete with Novo for market share in the GLP-1 drug market. Because Ozempic and Wegovy were listed on the FDA's drug shortage list, pharmacies were permitted under both Sections 503A and 503B to compound injectable semaglutide drug products that were essentially copies of Novo's FDA-approved drugs Ozempic and Wegovy. Hundreds of pharmacies rushed to provide injectable semaglutide to the U.S. market.

18

58.    *Bloomberg* reported on July 22, 2024 that the estimated market for *compounded* GLP-1 drugs reached at least $1 billion by 2024. Most of that market was for injectable semaglutide.

59.    Similarly, *Reuters* reported in November 2024 in an article titled "Exclusive: Thousands turn to Wegovy copies each month as FDA considers shortage status" that more than 200,000 prescriptions for compounded Wegovy alternatives were being filled in the U.S. each month, and that prescriptions filled for Novo's branded Wegovy each month were about four times that of compounded versions, meaning that compounded Wegovy alternatives were approximately 20% of the total market for Wegovy in the U.S. It is also estimated that in 2025, nearly one quarter of Americans who had ever taken a GLP-1 drug reported using a compounded version.

60.    Notably, approximately 11% of consumers of GLP-1 drugs in 2025 obtained their GLP-1 drugs through online health platforms like *Hims & Hers Health, Inc.* ("Hims"), *Mochi Health Corp.* ("Mochi"), and *Noom, Inc.* ("Noom"), which connect patients with licensed healthcare providers and then fill and ship prescriptions directly to consumers. Commonly referred to as "telehealth" providers, these companies often operate as fully integrated consultation-to-fulfillment ecosystems, employing the licensed healthcare provider who provides patient

19

consultations and writes prescriptions, as well as operating the pharmacy that compounds and ships prescriptions directly to consumers.

61. Consumers' widespread acceptance of compounded semaglutide was driven in large part by the significant cost savings these products offered compared to Novo's branded versions. While the list prices for Wegovy and Ozempic were around $1,349 and $1,000 per month, respectively, compounding pharmacies were able to offer semaglutide treatments for a mere fraction of that price—frequently between $200 and $400 per month. For patients without comprehensive insurance coverage for weight-loss medications, these lower-cost alternatives provided an accessible entry point to treatment that was otherwise financially prohibitive.

62. This stark price disparity created a massive competitive hurdle for Novo, as patients increasingly preferred the significantly cheaper compounded alternatives. Telehealth platforms leveraged this "fraction-of-the-cost" advantage to capture and retain a loyal customer base, ensuring that even after the official drug shortage ended, a large segment of the market remained incentivized to continue using compounded versions over Novo's branded products.

**D. Novo Acquires Manufacturing Facilities in an Effort to Quickly Increase Supply in the U.S. and Remove Semaglutide from the Drug Shortage List**

63. In response to the Wegovy and Ozempic shortages, and to protect and expand its market dominance in the GLP-1 class, Novo sought to increase its production capacities for semaglutide, the API in Wegovy and Ozempic.

64.    Beginning in late 2021 and continuing through 2022, Novo committed substantial capital to expanding and constructing new manufacturing facilities in Denmark. These investments were to scale up semaglutide manufacturing in anticipation of continued high demand. However, these initial steps failed to fully resolve the supply constraints.

65.    By November 2023, recognizing the need for further and more significant action, Novo announced one of the largest single investments in its history: approximately $6 billion dedicated primarily to expanding semaglutide production capacity in Denmark. Additional investments were made in France for aseptic fill-finish capabilities. These projects were explicitly designed to address the ongoing global shortages of Ozempic and Wegovy and were estimated to come online in phases beginning in late 2025.

66.    In 2024, Novo accelerated its capacity-expansion efforts. Through its affiliate, the Company secured three advanced sterile fill-finish manufacturing sites previously operated by Catalent in the United States, Italy, and Belgium. That same year, Novo announced its intention to construct a second major fill-and-finish facility in North Carolina, specifically to increase production of injectable GLP-1 products including Ozempic and Wegovy.

67.    As a direct result of the foregoing capacity expansion efforts, Novo was able to convince the FDA that Novo's supply of Ozempic and Wegovy was

21

sufficient to meet demand. On February 21, 2025, the FDA formally declared the semaglutide injection shortage resolved and removed Ozempic and Wegovy from the national drug shortage list after nearly three years.

68.    While Novo's manufacturing capacity expansions ultimately allowed Novo to serve a greater number of patients worldwide, the prolonged drug shortage period (March 2022 to February 2025) had enabled compounders to rush in and capture market share of the GLP-1 drug market. As discussed below, due to the compounding pharmacies' favorable pricing, Novo has been unable to regain the market share it lost.

E.  **The FDA Removes Semaglutide from the Shortage List in February 2025, Yet Pharmacies Continue Compounding Semaglutide Under the Personalization Exemption, Preventing Novo from Reclaiming Market Share**

69.    On February 21, 2025, the FDA published a letter from the Acting Director of the FDA's Center for Drug Evaluation and Research to Robert Fischer, the FDA's Director of Regulatory Affairs (the "Fischer Letter"), that stated the FDA's determination that "the shortage of semaglutide injection products, which first began in March 2022 for Wegovy and August 2022 for Ozempic, is resolved."

70.    The Fischer Letter effectively removed Wegovy and Ozempic from the FDA's drug shortage list, thereby ending the circumstances under which pharmacies operating under Sections 503A and 503B could compound drug products that were essentially a copy of Ozempic or Wegovy.

22

71.     In the Fischer Letter, the FDA announced that it would not take enforcement action against compounders for violations "arising from conditions that depend on semaglutide injection products' inclusion on the FDA drug shortage list" for a short period of time to "avoid unnecessary disruption to patient treatment and to help facilitate an orderly transition" and to "allow patients a reasonable amount of time to transfer their prescriptions, as needed, to different pharmacies to obtain the FDA-approved drug."

72.     The Fischer Letter specified that the period of no-action against pharmacies operating as outsourcing facilities under Section 503B would last for 90 days, extending to May 22, 2025, while the period of no-action against Section 503A pharmacies that compound semaglutide based on the commercial availability exemption would be 60 days, extending only to April 22, 2025.

73.     Notably, the Fischer Letter was silent on the personalization exemption found in Section 503A. In other words, the Fischer Letter did nothing to curtail the compounding of personalized injectable semaglutide drug products that were not essentially a copy of a commercially available drug. Thus, even after the publication of the Fischer Letter, compounders operating under Section 503A could still compound injectable semaglutide drug products so long as that compounding was supported by prescriptions with patient-specific changes requested.

23

74. Accordingly, compounding pharmacies that operated under the commercial availability exemption of Section 503A began to fully transition their business to prescriptions for semaglutide that provided some change for specific patients to qualify for the personalization exemption.

75. For example, an archive of *Strut Health LLC's* ("*Strut*") website shows that *Strut* was compounding semaglutide with certain changes in delivery method or formulation to qualify for the personalization exemption (*e.g.*, delivered in lozenge form rather than injection or containing a supplemental dose of vitamin B-6) as early as March 2024. *Strut* continues to offer injectable semaglutide combined with vitamin B-6 (pyridoxine) as a once-weekly compounded drug product, while specifying that the compounded product is only available "[i]f medically necessary[.]"

76. Additionally, on February 21, 2025, the day the Fischer Letter was published, Hims CEO Andrew Dudum responded publicly in a post on X, stating: "Now that the FDA has determined the drug shortage for semaglutide has been resolved, *we will continue to offer access to personalized treatments* as allowed by law to meet patient needs."[3]

77. Similarly, Noom CEO Geoff Cook publicly responded to the Fischer Letter on February 21, 2025 in a post on LinkedIn.com that "[t]oday, nothing

---

[3] All emphasis is added unless otherwise specified.

changes about our focus on our patients and continuing to combine powerful behavior change with needed medications to help treat chronic conditions. *We'll continue to prioritize patients' needs first and offer access to personalized treatments*, including lifestyle change, in compliance with the law."

**F. Defendants Know that, Contrary to Their Public Statements, Compounding Pharmacies Can, and Do, Lawfully Continue to Sell Semaglutide "En Masse" Under the Personalization Exemption, Which Negatively Impacts Novo's Sales and Market Share**

78.    Private communications obtained by Plaintiffs' public records requests to several states' boards of pharmacy demonstrate Defendants knew that, despite the FDA's removal of semaglutide from the shortage list, compounding pharmacies were continuing to lawfully operate under the personalization exemption to sell compounded semaglutide to millions of patients and that it was negatively impacting Novo's sales and market share. Defendants admit they were personally aware of, and authorized, such communications with regulators during a July 29, 2025 conference call, stating "*we're working with regulators*" to limit compounding.

79.    For example, Plaintiffs' public records request to the California State Board of Pharmacy pursuant to the California Public Records Act has revealed that Novo's outside legal counsel, Covington & Burling LLP ("Covington"), as well as senior Novo executives, including Robert Clark ("Clark"), Novo's Vice President of Regulatory Affairs, and Jason Brett ("Brett"), Novo's Principal Medical Head of Medical Affairs, communicated with California state regulators on behalf of Novo

seeking enforcement action against compounders engaged in what the Company claimed was "violative compounding, including compounding under the pretext of 'personalization[.]'"

80. In particular, in a March 20, 2025 letter from Clark to the California State Board of Pharmacy, Novo attacked compounders' use of the personalization exemption, claiming that:

> Compounders attempt to justify their compounding of "semaglutide" products based on supposed clinical needs of patients. . . . However, in those cases where a prescriber determines that a patient needs another drug to complement their therapy, such as vitamin B-6 or B-12, the patient could easily be separately prescribed that vitamin B-6 or B-12 medication alongside an FDA-approved semaglutide medicine, rather than be prescribed an unapproved compounded "semaglutide" product in which the "semaglutide" is mixed with vitamin B-6 or B-12.

This letter demonstrates that Defendants understood the compounding pharmacies' conduct and strategies, like mixing semaglutide with vitamins like B-6 or B-12, which allowed these pharmacies to continue mass production outside of the shortage list. It also demonstrates Defendants were concerned about the competitive threat posed by compounders using the personalization exemption.

81. Plaintiffs' public records request to the California State Board of Pharmacy likewise revealed that Covington, Novo's agent, sent a letter signed by Clark to the Executive Director of the California State Board of Pharmacy as early as June 28, 2024, stating that Novo had been engaged in "surveillance and testing" of compounded GLP-1 drugs and requesting that the Board "consider taking

26

additional actions" against compounded semaglutide, which Clark asserted was "unlawful[,]" "illegal and unsafe[.]" Novo sent a similar letter on June 28, 2024, also signed by Clark, to the South Carolina State Board of Pharmacy noting that "Novo Nordisk has seen several entities sell compounded 'semaglutide' in combination with other ingredients or in other dosage forms[,]" changes that are commonly made for personalized compounded drugs.

82. Plaintiffs' public records request to the Michigan Department of Licensing and Regulatory Affairs pursuant to the Michigan Freedom of Information Act reveals that Covington and Clark sent similar communications to the Michigan State Board of Pharmacy on the same day, requesting the state board take action to "address unlawful and potentially dangerous compounding of 'semaglutide' products" that were observed to be sold "in dosage forms and with routes of administration" that differed from the FDA-approved drugs, Ozempic and Wegovy.

83. These June 28, 2024 letters demonstrate that Defendants and their agents were closely monitoring, and clearly concerned about, the threat posed by compounded semaglutide by no later than June 2024.

84. Documents produced in response to Plaintiffs' public records requests further show that Novo executives continued to send letters to states' boards of pharmacy in the months leading up to, and during the Class Period. For instance, on May 29, 2025, Novo's outside legal counsel, as well as senior Novo executives Clark

and Brett, contacted Michigan state regulators seeking enforcement action against compounders intending to engage in what the Company claimed was "violative compounding, including compounding under the pretext of 'personalization[.]'"

85.   On April 23, 2025, Covington, acting as the Company's agent, emailed Michigan State Administrative Manager Kerry Przybylo with a "Request to Submit Supportive Comment for Novo Nordisk Citizen Petition and End of Semaglutide Injection Shortage."[4] As part of this request, Novo's agent noted that:

> Despite the limited enforcement discretion periods announced by FDA*, we are concerned that some compounders still plan to produce so-called "personalized" drugs claiming to contain semaglutide*, including drugs combining this complicated peptide with additional active ingredients and different inactive ingredients, strengths, and routes of administration to effectively circumvent the statutory restrictions in the FDCA on compounding copies and related state laws. *We also are concerned that some telehealth companies may continue to partner with state-licensed compounders to sell such drugs en masse nationwide*.[5]

86.   This April 2025 request also included a letter from Clark and Brett raising the alarm that "some compounding pharmacies appear poised to *continue to engage in large-scale compounding of 'semaglutide' using a pretextual 'personalization' strategy* to effectively circumvent the statutory restrictions in section 503A on compounding copies and related state laws."

---

[4] The FDA has established a docket allowing for submission of petitions to the Agency to request that the Commissioner issue, amend, or revoke a regulation or order, or to refrain from taking any other form of administrative action.

[5] Covington, acting on behalf of Novo, sent a substantially similar communication to the California State Board of Pharmacy on April 23, 2025.

28

87.    Illustrating the granular detail in which Novo executives monitored compounding pharmacies' use of the personalization exemption, the letter also identified specific statements by individual telehealth companies, noting:

Noom, a prominent telehealth company, recently began promoting 'Noom GLP-1Rx with SmartDose,' with an emphasis on a 'personalized GLP-1 program.'[] Such efforts are naked attempts to compound and market **high volumes of 'semaglutide' drugs under the guise of 'personalization**.'

88.    Also on April 23, 2025, Covington, acting on behalf of Novo, sent a similar request to Kayce Shealy, the Board Executive of the South Carolina State Board of Pharmacy. That request included a draft statement Novo wanted the South Carolina Board to submit to the FDA expressing support for Novo's nomination of semaglutide to the FDA's list of drug products that present demonstrable difficulties for compounding (the "Difficult to Compound List"). This draft statement acknowledged that "[w]e are concerned that the resolution of the Ozempic® and Wegovy® shortages may encourage unnecessary compounding of semaglutide products that differ from the FDA-approved medicines under the pretext of 'personalization.'"

89.    On April 23, 2025, Covington sent a request to Anne Sodergren at the California State Board of Pharmacy that was substantially identical to the request sent to the South Carolina State Board of Pharmacy that day. Covington followed up on April 30, 2025 with another email requesting regulatory action against

29

"compounding under the pretext of 'personalization[,]'" arguing that "[c]ompounders cannot rely on mere pretextual differences between compounded drugs and FDA-approved medicines as a means to avoid the copies restriction in the FDCA. Pretextual compounding under the guise of 'personalization' poses acute and direct safety risks for patients, especially since semaglutide is a complex peptide that is difficult to compound."

90.    These internal records confirm that, while Defendants were publicly assuring the market that the compounding threat was non-existent or temporary and would "wind down" after May 22, 2025, as described below, they were privately pleading with state regulators to help them close a "personalization" loophole that they knew existed and which they misleadingly described as "rare." These internal records also show that Defendants knew that the personalization exemption was a permanent, lawful, and devastatingly effective pathway for competitors to retain Novo's lost market share.

91.    Defendants also pursued legal action to shut down compounding pharmacies. In total, between June 2023 and July 2025, Novo filed more than 100 lawsuits against compounding pharmacies alleging trademark infringement, deceptive advertising, and other related claims in an attempt to stymie compounding pharmacies' sales of compounded semaglutide drug products. Notably absent from

30

these lawsuits were any legal claims that compounding semaglutide under the personalization exemption was unlawful.

**G. Despite Defendants' Efforts to Deter Compounding During the Class Period, the Personalization Exemption Remains a Lawful Avenue for Pharmacies to Produce Compounded Semaglutide Drugs that Directly Compete with Novo's Branded Drugs**

92.    Despite Defendants' internal knowledge that compounded semaglutide had taken, and continued to take, Novo's market share, throughout the Class Period, Defendants assured investors that compounding pharmacies were not a threat to Novo's business and that compounding would be illegal except in rare circumstances once the drug shortage and grace period was over. For example, during the November 7, 2024 CNBC interview, when asked whether compounders were an increasing or a receding threat, Defendant Jørgensen rejected the premise of the question and replied that "we don't see them as a real threat" before deflecting his reply to patient safety concerns. Later, when Novo was forced to admit that compounders *were* negatively impacting the Company's semaglutide sales, Defendants assured investors that compounders were a temporary impediment that would go away after the shortage was over, falsely stating on numerous occasions that compounding semaglutide would be "illegal except for rare circumstances" after the shortage. *See Infra*, §V. Defendants' Materially False and Misleading Statements and Omissions.

31

93.    Contrary to Defendants' claims, compounding pharmacies were lawfully allowed to produce compounded products en masse under the personalization exemption. Accordingly, the FDA was not going to prevent mass production of compounded semaglutide under the personalization exemption. Indeed, while the FDA sent approximately 19 warning letters to pharmacies between October 2023 and the end of the Class Period regarding semaglutide, these letters warned pharmacies about the unlawful *marketing* of compounded semaglutide drug products. In many of these letters, the FDA simply warned that certain drug products being advertised and promoted were "misbranded" or "unapproved" drugs. The FDA, however, never suggested that the personalization exemption could not be used to compound semaglutide drug products, even en masse, as long as it is done pursuant to a prescription containing a change requested by the prescriber for a specific patient.

94.    Thus, despite Defendants' claims to investors that "mass personalization" was illegal, the FDA never indicated any intent to take enforcement action during the Class Period against pharmacies who were compounding semaglutide drug products under the Section 503A personalization exemption.

95.    Even after the Class Period, the FDA's actions against compounding pharmacies continue to be limited to the ways in which the pharmacies market and brand compounded semaglutide. For instance, on September 9, 2025, the FDA sent

32

warning letters to approximately 55 pharmacies, indicating that by describing compounded semaglutide as containing the same API as name-brand weight-loss drugs, or as being a generic version of those branded drugs, they were misbranding their compounded semaglutide products, in violation of Section 301(a) of the FD&C Act.

96.    Thus, the FDA warning letters only ever expressed concern with how pharmacies *marketed* compounded semaglutide—not that they were violating the Section 503A personalization exemption.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

### A.    False and Misleading Statement in the November 6, 2024 *Reuters* Article

97.    On November 6, 2024, *Reuters* released an article titled "Novo Nordisk CEO on Wegovy prices, supplies and compounding" that included highlights of comments made by Defendant Jørgensen during an interview with *Reuters*. In a section of the article titled "ON COMPOUNDING[,]" *Reuters* reported that Jørgensen, when asked about compounding, stated: "**[Compounding is] not something that's impacting our business as of today**."[6]

98.    The above statement in ¶97 was materially false and misleading when made because:

---

[6] The statements Plaintiffs allege are false and misleading are bolded and underlined. The remaining statements are included for context.

33

a. As early as June 28, 2024, Novo's senior executives and agents from Covington had already contacted state boards of pharmacy to complain about purported "unlawful" sales of semaglutide by compounders. These communications contained admissions that Novo was engaged in "surveillance and testing" of competitors and their compounded drugs that were actively and successfully taking sales from Novo.

b. At the time of the statement, the total market for *compounded* GLP-1 drugs was at least $1 billion and consisted primarily of compounded, injectable semaglutide drug products that were essentially copies of Novo's Ozempic and Wegovy drugs. In November 2024, approximately 20% of the market for Wegovy prescriptions was being filled by compounded semaglutide. Accordingly, at the time of Jørgensen's statement, Novo had already lost as much as $1 billion of market share of the GLP-1 drug market, and approximately 20% of the Wegovy market, to compounding pharmacies.

c. Contrary to Jørgensen's claim of no impact, Novo had already filed more than 50 lawsuits against compounding pharmacies by November 6, 2024. In these legal filings, Novo explicitly alleged that these pharmacies were successfully "attract[ing] customers" and that Novo

34

was "losing goodwill and/or sales" as a direct result of the compounding marketplace. *See infra*, §VII.B.

d. The massive price disparity between Novo's branded drugs and compounded drugs was already causing a shift in consumer behavior that favored compounded alternatives over Novo's branded products, which ultimately led to Novo launching a competing service, NovoCare, to compete with compounders. *See infra*, §VII.D.

## B. False and Misleading Statements Made During the November 7, 2024 CNBC Interview

99. On November 7, 2024, Jørgensen participated in a CNBC interview during a "Money Movers" segment titled "Novo Nordisk CEO on earnings: Very bullish on 2025 despite demand concerns." During the interview, CNBC host Carl Quintanilla asked: "Lars, at this point are the compounders an increasing or a receding threat?" Jørgensen then falsely claimed that:

**[W]e don't see them as a real threat.** I see it as a real concern for patients because as a company committed to high quality products, we collaborate with authorities around the world to make sure that the medicine we bring to patients are inspected. They are approved, they're regulated. And in the compounding space, I'm really concerned about, what we see, where these are products potentially not approved APIs coming from overseas, from China elsewhere, and then, formulated, filled in the U.S. So, I think that's a real issue for patient and, you know, if they believe they're getting a product that, comes from a trusted company like Novo Nordisk, and that's not the case, I think that's a real issue. So we are collaborating with the FDA to make sure that they can trust what we bring. We are scaling up manufacturing. We have the drug shortage notification removed for our products, so we are really ramping up so patients can get a product that's approved and regulated by the FDA and

35

they can trust, what they get from a company like Novo Nordisk. And we are not supplying semaglutide, the molecule in these products we're talking about to anyone. **So, the only way to get semaglutide is to get it from Novo Nordisk.**

(cleaned up).

100. The above statements in ¶99 were materially false and misleading when made because:

    a. As early as June 28, 2024, Novo's senior executives and agents from Covington had already contacted state boards of pharmacy to complain about purported "unlawful sales" of semaglutide by compounders. These communications contained admissions that Novo was engaged in "surveillance and testing" of competitors and their compounded drugs that were actively and successfully taking sales from Novo.

    b. At the time of the statement, the total market for *compounded* GLP-1 drugs was at least $1 billion and consisted primarily of compounded, injectable semaglutide drug products that were essentially copies of Novo's Ozempic and Wegovy drugs. In November 2024, approximately 20% of the market for Wegovy prescriptions was being filled by compounded semaglutide. Accordingly, at the time of Jørgensen's statement, compounded versions of Ozempic and Wegovy were a real threat, as evidenced by the fact Novo had already lost as much as $1 billion of market share of the GLP-1 drug market, and

36

approximately 20% of the Wegovy market, to compounding pharmacies.

c. Contrary to Jørgensen's claim of no impact, Novo had already filed more than 50 lawsuits against compounding pharmacies by November 6, 2024. In these legal filings, Novo explicitly alleged that these pharmacies were successfully "attract[ing] customers" and that Novo was "losing goodwill and/or sales" as a direct result of the compounding marketplace. *See infra*, §VII.B.

d. The massive price disparity between Novo's branded drugs and compounded drugs was already causing a shift in consumer behavior that favored compounded alternatives over Novo's branded products, which ultimately led to Novo launching a competing service, NovoCare, to compete with compounders. *See infra*, §VII.D.

e. Novo was not the only source of semaglutide drugs. Approximately 1 million patients were already obtaining semaglutide from sources other than Novo Nordisk. Hundreds of state-licensed pharmacies were producing and shipping semaglutide drug products directly to consumers through popular telehealth platforms.

f. Under Sections 503A and 503B of the FD&C Act, compounding pharmacies were legally permitted to produce semaglutide during the

37

FDA-recognized shortage. Even beyond the shortage, the personalization exemption allowed pharmacies to continue producing semaglutide by making adjustments for individual patients.

**C. False and Misleading Statements Made During April 29, 2025 ABC News Interview**

101.    During an April 29, 2025 ABC News interview segment titled "Telehealth brands to sell Wegovy at reduced price[,]" ABC News host Diane Macedo asked Defendant Moore about Novo's partnership with Hims announced the same day: "[T]elehealth companies have made millions aggressively marketing compounded versions of your medications. So why are you collaborating with them now?" Moore replied:

> The time is important because a few weeks back where Wegovy was removed from the drug shortage list, and **at that time it made compounding Wegovy illegal except for rare circumstances**. And now that we have built up our supply and we've invested extensively over the course of the last year to ensure that we can supply Wegovy to all patients, and **now is the time as compounding starts to wind down that we're in a place so that people can transition to the real Wegovy, the real semaglutide GLP-1 for weight loss.**

(cleaned up).

102.    Following up, the host asked "do you have any assurances that [telehealth companies will] stop selling these compounded versions? Now that the FDA has said that it should end because of the shortage?" In response, Moore again falsely claimed that "[w]e feel confident that the FDA will enforce the rules, **and**

38

**that is after May 22nd compounding in a mass way is deemed illegal by FDA, except for rare circumstances**" (cleaned up), thereby giving investors the false impression that after the end of the shortage, compounding semaglutide drugs would be "rare" and Novo would no longer face intense competition from compounded semaglutide.

103.    The above statements in ¶¶101-02 were materially false and misleading when made because:

    a.  Contrary to Moore's claim that mass compounding was "deemed illegal by [the] FDA, except for rare circumstances," Section 503A and the operative FDA Guidance expressly permitted pharmacies to compound medications, including semaglutide, outside of a shortage through the personalization exemption. This exemption allows for mass production so long as a prescriber identifies a patient-specific change. Accordingly, the personalization exemption remained a valid and legal pathway for pharmacies to produce semaglutide regardless of shortage status.

    b.  On March 20, 2025, Robert Clark, Novo's Vice President of Regulatory Affairs, wrote a letter to California's Department of Consumer Affairs, Board of Pharmacy, advocating for greater restrictions to be placed upon pharmacies that compound using the personalization exemption, showing Defendants knew personalization was not rare or illegal at the

39

time of the misstatement, nor would it be after the end of the FDA's grace period.

c.  Just six days prior to this interview, on April 23, 2025, Novo's own senior executives and legal counsel had sent letters to California, Michigan, and South Carolina regulators admitting that compounding pharmacies appeared poised to continue "large-scale compounding" using a "'personalization' strategy." Moore's public claim that such activity was "illegal … except for rare circumstances" was a direct contradiction of Novo's private admission that competitors were successfully using a valid legal strategy to continue selling "en masse."

d.  Novo and its agents also argued to state boards that the FDA Guidance "misinterprets" the law. By calling mass compounding "illegal" to the public, Moore was presenting Novo's *desired* regulatory outcome as an existing legal reality, despite knowing that the current rules actually permitted the very competition he claimed was banned.

e.  There was no evidence supporting Moore's claim of a "wind down" in pharmacies' compounding of semaglutide; rather, there had been a seamless transition from shortage-based compounding to personalization-based compounding.

40

104.  A UBS Global Research report published on May 2, 2025 noted that "[g]iven investor disappointment from the weak Wegovy prescription trends in the US YTD, we see proactive management actions as encouraging that volume momentum may build into 2H, *especially as compounded semaglutide is gradually withdrawn from the market*." UBS's report shows that the market believed Defendants' misstatements designed to give investors the false impression that compounded semaglutide would only be available to patients in "rare circumstances" after May 22, 2025.

### D.  False and Misleading Statements Made in the May 7, 2025 Earnings Call

105.  On May 7, 2025, Defendants held an earnings call with analysts to discuss the Company's first quarter 2025 results ("Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Moore acknowledged that "compounded GLP-1s in the U.S. is estimated to have impacted the uptake of Wegovy prescriptions and the growth of the branded obesity market *during the first quarter of 2025,*" but falsely assured investors that because there was no longer a shortage of injectable semaglutide, compounding the drug was now rare and illegal in most cases, stating in relevant part:

> In February, the FDA removed semaglutide from the drug shortage list. **As a result, it is now illegal under U.S. compounding laws to make or sell compounded semaglutide drugs, except with rare exceptions**. Novo Nordisk is working to prevent unlawful and unsafe compounding of semaglutide in the U.S., while making sure patients have access to safe, legitimate semaglutide produced by Novo Nordisk.

41

106.    Defendant Knudsen then discussed the Company's quarterly results and Novo's updated guidance following both the Hims partnership and the FDA's announcement regarding compounded GLP-1 drugs, stating:

> **For 2025, the range for sales growth is now expected to be 13% to 21% at constant exchange rates** . . . The new range reflects lower-than planned penetration of branded GLP-1 treatments in the U.S. impacted by compounded GLP-1s.
>
> The outlook reflects expectations for sales growth in U.S. operations and international operations, **mainly driven by volume growth of GLP 1-based treatments for obesity and diabetes. Following the U.S. FDA removal of semaglutide injectables from the drug shortage list, the sales outlook assumes a reduction in patients on compounded GLP-1 treatments during the second half of 2025**.

107.    A question-and-answer segment followed Defendants' prepared remarks, during which Defendants made several additional materially false and misleading statements in response to analyst questions concerning the Company's guidance and the impact of compounded GLP-1 drugs on Novo's forecast, including in the following exchanges:

> <Q: James Patrick Quigley – Goldman Sachs Group, Inc. – Research Analyst>
> So one on the guidance and one follow-up on the compounding pharmacy. So on the guidance, if we sort of assume a similar second quarter as in the first quarter, then the scenarios for progression in the second half are quite wide with around 8% growth at the bottom end and 22%, 23% growth at the upper end. So could you reconcile the potential outcomes? What are the most important variables there? And what are the key assumptions for both end of those variables?
>
> And secondly, on compounding. You mentioned that having a significant impact, but have you got any more details of what the drag is on Wegovy

42

market share? And have you done any surveys or how -- of what you think how many patients might drop off versus switch to branded and the branded switch to the Wegovy versus switching to tirzepatide because you mentioned you have factored that into the guidance, just wondering how much that is factored into the guidance?

\* \* \*

<A: Defendant Knudsen> So specifically to the guidance ranges, **this means in terms of the main drivers that a lot of patients on compounded products will go to branded products in the second half of this year**, and we will be able to enable that through the cash channel and NovoCare and the telehealth collaborations.

\* \* \*

And I would say on compounding specifically, given that the data quality on a number of patients on compounding is not very high, then it's based on market research, where **we're looking at 1 million or more patients on compounded GLP-1 today. And then we've made estimates based on how many patients will either be able to benefit from the personalized exception or will drop off treatment. And as a consequence, the rest will go to a branded product**.

108.   The above statements in ¶¶105-07 were materially false and misleading when made because:

   a. Contrary to Moore's claim that mass compounding was "now illegal … except with rare exceptions," Section 503A and the operative FDA Guidance expressly permitted pharmacies to compound medications, including semaglutide, outside of a shortage through the personalization exemption. This exemption allows for mass production so long as a prescriber identifies a patient-specific change. Accordingly,

43

the personalization exemption remained a valid and legal pathway for pharmacies to produce semaglutide regardless of shortage status and compounding was not rare or generally illegal as Defendants falsely claimed.

b. On March 20, 2025, Robert Clark, Novo's Vice President of Regulatory Affairs, wrote a letter to California's Department of Consumer Affairs, Board of Pharmacy, advocating for greater restrictions to be placed upon pharmacies that compound using the personalization exemption, showing that personalization was not rare or illegal at the time of the misstatement, nor would it be after the end of the FDA's grace period.

c. On April 23, 2025, Novo's own senior executives and legal counsel had sent letters to California, Michigan, and South Carolina regulators admitting that compounding pharmacies appeared poised to continue "large-scale compounding" using a "'personalization' strategy." Moore's public claim that such activity was "illegal … except with rare exceptions" was a direct contradiction of Novo's private admission that compounders were successfully using a valid legal strategy to continue selling "en masse."

44

d. On April 30, 2025, Covington sent another email to the California regulator requesting action against "compounding under the pretext of 'personalization[.]'"

e. Novo and its agents also argued to state boards that the FDA Guidance "misinterprets" the law. By calling mass compounding "illegal" to the public, Moore was presenting Novo's *desired* regulatory outcome as an existing legal reality, despite knowing that the current rules actually permitted the very competition he claimed was banned.

f. There was no evidence supporting Knudsen's assertions that pharmacies' compounding of semaglutide was in decline and would benefit Novo's sales; rather, there had been a seamless transition from shortage-based compounding to personalization-based compounding. Indeed, Novo disclosed in May 2025 that the Company's internal market research indicated that there were approximately 1 million patients using compounded GLP-1 for obesity treatment and two months later, at the end of July 2025, that number had not declined at all.

g. For the above reasons, Defendants' forecasts and statements that patients would switch back to Novo's far more expensive brand name drugs in the second half of 2025 lacked a reasonable basis.

109. The market trusted Novo's misleading representations that compounded semaglutide would no longer be available to patients in mass volumes once the post-shortage grace period ended, and Novo's misleading representations artificially inflated, or maintained the artificial inflation in, the market price of Novo's ADRs.

110. A report published by Barclays on May 8, 2025 noted that "[d]espite a guidance cut, NOVO shares traded higher" in part because of "NOVO emphasizing the 1Q25 Wegovy underperformance was largely driven by compounding impact[]" and "[t]his underperformance is expected to ease post-May 22, with compounded GLP-1 formulations of semaglutide set to come off the market."

111. Similarly, an SEB Equity Research report published on May 8, 2025 clearly believed Defendants' misstatements, noting that while there was "a negative impact from compounding Semaglutide on U.S. Wegovy script trends and to a smaller extent on Ozempic script trends[,] [t]he 22 May ban on compounders and other key measurements is set to boost scripts in H2."

112. A UBS Global Research report published the same date mirrored Defendants' false and misleading statements, advising investors that "2H uptick should be expected given . . . a lack of cheaper compound options should see volume shift to branded options."

46

113.    Likewise, a report published by Seeking Alpha on May 9, 2025 reported that "management also reminds us that later this month, the headwinds associated with the compounding may be reversed, given the FDA decision to restrict the practice as the products are no longer suffering from supply shortages."

**E. False and Misleading Statements in the May 7, 2025 Investor Presentation**

114.    On May 7, 2025, Defendants gave a presentation updating investors on the Company's performance in the first three months of 2025. On a slide titled "US branded anti-obesity medication market continues to expand while compounded GLP-1 volumes have increased[,]" Defendants minimized the threat of compounded GLP-1 drugs by falsely claiming that "**[i]t is now illegal under US compounding law to make or sell compounded semaglutide, with rare exceptions**."

115.    The above statement in ¶114 was materially false and misleading when made because:

   a. Contrary to Defendants' claim that mass compounding was "now illegal," Section 503A and the operative FDA Guidance expressly permitted pharmacies to compound medications, including semaglutide, outside of a shortage through the personalization exemption. This exemption allows for mass production so long as a prescriber identifies a patient-specific change. Accordingly, the personalization exemption remained a valid and legal pathway for pharmacies to produce

47

semaglutide regardless of shortage status and compounding was not generally illegal as Defendants falsely claimed.

b. On March 20, 2025, Robert Clark, Novo's Vice President of Regulatory Affairs, wrote a letter to California's Department of Consumer Affairs, Board of Pharmacy, advocating for greater restrictions to be placed upon pharmacies that compound using the personalization exemption, showing that personalization was not rare or illegal at the time of the misstatement, nor would it be after the end of the FDA's grace period.

c. On April 23, 2025, Novo's own senior executives and legal counsel had sent letters to California, Michigan, and South Carolina regulators admitting that compounding pharmacies appeared poised to continue "large-scale compounding" using a "'personalization' strategy." Defendants' public claim that such activity was "illegal … with rare exceptions" was a direct contradiction of Novo's private admission that competitors were successfully using a valid legal strategy to continue selling "en masse."

d. On April 30, 2025, Covington sent another email to the California regulator requesting action against "compounding under the pretext of 'personalization[.]'"

48

e.  Novo and its agents also argued to state boards that the FDA Guidance "misinterprets" the law. By calling mass compounding "illegal" to the public, Moore was presenting Novo's *desired* regulatory outcome as an existing legal reality, despite knowing that the current rules actually permitted the very competition he claimed was banned.

**F.  False and Misleading Statements Made on May 7, 2025 Bloomberg Podcast Episode**

116.  During a May 7, 2025 *Bloomberg Talks* podcast episode titled "Novo Nordisk CEO Talks Earnings, Product Competition[,]" the Bloomberg host asked Defendant Jørgensen:

> So Novo has been facing increased competition from compounding pharmacies of your drugs in the US. The shortage is now over, so those compounded versions won't be selling after May 22nd. Your CFO told Bloomberg earlier today that you expect to see a step up in business as a result, but at the same time, you lowered your full year forecast this morning due to that increased competition. And I wonder how we should be thinking about squaring that circle.

In response, Jørgensen falsely stated:

> Yeah, you're right. **We are now in situation where we can supply the domain in the US and if they has [sic] taken us off the drug shorts list. And that means that it's illegal to do compounding. So that has to stop, and that creates the opportunity for us to drive a bigger growth in, in, the scripts, for the legitimate high quality product from Novo Nordisk**. And when we lower the guidance for the full year, it is really because of what the impact was of compounding in the first quarter and probably also a bit into the second quarter. And we have a relative steep comparator in the second half of the year. **So you should see this guidance as one of us really stepping up in the second half of the year and getting to more and more patients and really moving forward in a business**

49

**environment with a much, much lower compounded share of the business, really down to you know, the rare cases where personalized is really needed, no bulk compounding, taking place**.

117. The above statements in ¶116 were materially false and misleading when made because:

a. Contrary to Jørgensen's claim that it was "illegal to do compounding[,]" Section 503A and the operative FDA Guidance expressly permitted pharmacies to compound medications, including semaglutide, outside of a shortage through the personalization exemption. This exemption allows for mass production so long as a prescriber identifies a patient-specific change. Accordingly, the personalization exemption remained a valid and legal pathway for pharmacies to produce semaglutide regardless of shortage status and compounding was not generally illegal as Defendants falsely claimed.

b. On March 20, 2025, Robert Clark, Novo's Vice President of Regulatory Affairs, wrote a letter to California's Department of Consumer Affairs, Board of Pharmacy, advocating for greater restrictions to be placed upon pharmacies that compound using the personalization exemption, showing that personalization was not rare or illegal at the time of the misstatement, nor would it be after the end of the FDA's grace period.

c. On April 23, 2025, Novo's own senior executives and legal counsel had sent letters to California, Michigan, and South Carolina regulators admitting that compounding pharmacies appeared poised to continue "large-scale compounding" using a "'personalization' strategy." Jørgensen's public claim that such activity was "illegal" and exceptions were "rare" was a direct contradiction of Novo's private admission that competitors were successfully using a valid legal strategy to continue selling "en masse."

d. On April 30, 2025, Covington sent another email to the California regulator requesting action against "compounding under the pretext of 'personalization[.]'"

e. Novo and its agents also argued to state boards that the FDA Guidance "misinterprets" the law. By calling mass compounding "illegal" to the public, Jørgensen was presenting Novo's *desired* regulatory outcome as an existing legal reality, despite knowing that the current rules actually permitted the very competition he claimed was banned.

f. There was no evidence supporting Jørgensen's assertions that pharmacies' compounding of semaglutide was in decline and would benefit Novo's sales; rather, there had been a seamless transition from shortage-based compounding to personalization-based compounding.

51

Indeed, Novo disclosed in May 2025 that the Company's internal market research indicated that there were approximately 1 million patients using compounded GLP-1 for obesity treatment and two months later, at the end of July 2025, that number had not declined at all.

g. For the above reasons, Defendants' forecasts and statements that patients would switch back to Novo's far more expensive brand name drugs and "drive a bigger growth" in the second half of 2025 lacked reasonable basis.

### G. False and Misleading Statement in the June 23, 2025 Press Release

118. On June 23, 2025, Novo issued a press release announcing that it terminated its partnership with Hims after only one month, removing Hims' direct access to Wegovy through the NovoCare Pharmacy. Novo falsely claimed that "**Hims & Hers Health, Inc. has failed to adhere to the law which prohibits mass sales of compounded drugs under the false guise of 'personalization[.]'**"

119. The above statement in ¶118 was materially false and misleading when made because:

a. Contrary to Novo's press release that asserted that "the law [] prohibits mass sales of compounded drugs" under the personalization exemption, Section 503A and the operative FDA Guidance expressly permitted

52

pharmacies to compound medications, including semaglutide, outside of a shortage through the personalization exemption. This exemption allows for mass production so long as a prescriber identifies a patient-specific change. Accordingly, the personalization exemption remained a valid and legal pathway for pharmacies to produce semaglutide regardless of shortage status and compounding under the personalization exemption was not rare or illegal as Defendants falsely claimed.

b. On March 20, 2025, Robert Clark, Novo's Vice President of Regulatory Affairs, wrote a letter to California's Department of Consumer Affairs, Board of Pharmacy, advocating for greater restrictions to be placed upon pharmacies that compound using the personalization exemption, showing that personalization was not illegal.

c. On April 23, 2025, Novo's own senior executives and legal counsel had sent letters to California, Michigan, and South Carolina regulators admitting that compounding pharmacies appeared poised to continue "large-scale compounding" using a "'personalization' strategy." Novo's public claim that such activity was prohibited by the law was a direct contradiction of Novo's private admission that competitors were successfully using a valid legal strategy to continue selling "en masse."

53

d. On April 30, 2025, Covington sent another email to the California regulator requesting action against "compounding under the pretext of 'personalization[.]'"

e. In a May 29, 2025 letter to the California State Board of Pharmacy, Novo and its agents argued that the FDA Guidance regarding compounding under the personalization exemption "misinterprets" the law. Novo's press release falsely presented to the public Novo's *desired* regulatory outcome as an existing legal reality, despite knowing that the current rules actually permitted the personalized compounding that Novo claimed was banned.

## VI.    THE TRUTH EMERGES

120.    On July 29, 2025, Defendants published a press release (the "July 29 Press Release"), announcing that "Novo Nordisk lowers sales and operating profit outlook for 2025." Specifically, on May 7, 2025, Novo had projected full-year 2025 sales growth of 13-21%, but on July 29, 2025, Defendants significantly lowered that projection to 8-14%. Likewise, while Defendants had previously forecasted operating profit growth of 16-24% on May 7, they slashed that outlook to 10-16% on July 29.

121.    The July 29 Press Release provided a comparison of Novo's earlier forecasts compared to their updated forecasts with the following chart:

54

| Outlook 2025 (CER) | Expectations 29 July | Expectations 7 May |
| --- | --- | --- |
| Sales growth | 8-14% | 13-21% |
| Operating profit growth (EBIT) | 10-16% | 16-24% |

122.  In the July 29 Press Release, Defendants elaborated on Novo's cut to full-year sales guidance, stating:

The lowered sales outlook for 2025 is driven by lower growth expectations for the second half of 2025. ***This is related to lower growth expectations for Wegovy® in the US obesity market, lower growth expectations for Ozempic® in the US GLP-1 diabetes market***, as well as lower-than-expected penetration for Wegovy® in select IO markets.

***For Wegovy® in the US, the sales outlook reflects the persistent use of compounded GLP-1s, slower-than-expected market expansion and competition.***

***Despite the expiry of the FDA grace period for mass compounding on 22 May 2025, Novo Nordisk market research shows that unsafe and unlawful mass compounding has continued, and that multiple entities continue to market and sell compounded GLP-1s under the false guise of 'personalisation'.*** Novo Nordisk is pursuing multiple strategies, including litigation, to protect patients from knockoff 'semaglutide' drugs. Novo Nordisk is deeply concerned that, without aggressive intervention by federal and state regulators and law enforcement, patients will continue to be exposed to the significant risks posed by knockoff 'semaglutide' drugs made with illicit or inauthentic foreign active pharmaceutical ingredients.

***As unsafe and unlawful mass compounding continues, the Wegovy® penetration within the cash channel has been lower-than-expected***. Within this channel, NovoCare® Pharmacy was launched in March 2025. Wegovy® prescriptions via NovoCare® Pharmacy (including TeleHealth collaborations) amount to around 11,000 total weekly prescriptions, in addition to around 20,000 weekly prescriptions in the retail cash channel. Novo Nordisk will continue to invest in the

expansion of direct-to-patient initiatives such as NovoCare® Pharmacy and further collaborations with telehealth organisations.

123. Novo's press release revealed to investors for the first time that compounding of semaglutide drugs under the personalization exemption of Section 503A was not rare in the U.S. after the FDA removed injectable semaglutide from the drug shortage list and, in fact, posed a serious threat to Novo's business.

124. The same day, Defendants issued a second press release, announcing that Novo's Executive Vice President of International Operations, Maziar Mike Doustdar, was appointed President and Chief Executive Officer, to succeed Defendant Jørgensen, who would step down from those roles on August 7, 2025.

125. During a conference call the same morning to field questions regarding Novo's announcements (the "July 29, 2025 Investor Call"), Defendant Knudsen elaborated on the guidance cut during the question-and-answer segment of the call:

> <Q: Sachin Jain – BofA Securities – Research Analyst> I just wanted to get a better understanding of what you're assuming for both Wegovy and Ozempic as we exit this year and into next year. So for Wegovy, ***I guess you're citing the main issue being compounders. So any color on how many patients still do you think compounded versus 1 million prior?*** And outside of litigation, which I guess could take quite a while. Is there anything that you can point to that would change that on a 6- to 9-month time frame?
>
> And I guess similar question on Ozempic, you have much looser commentary within the PR around path to growth. Comp remains tough, scripts aren't inflecting, assuming given the 5% to 10% price decline, fair to think that Ozempic is now trending towards sales declines from here?

56

* * *

<A: Karsten Munk Knudsen> … ***So specifically on compounding at Q1 in May, we said that our market research estimate was 1 million patients using compounded GLP-1 for obesity treatment. Then the FDA grace period for all compounding on the 503b ended on May 22, and our assumption was that, that would lead to increased patients using branded GLP-1s in the second half of this year. Unfortunately, our latest market research indicates that, that has not happened, and that's one of the assumptions that we have changed.*** So the latest market research ***still indicates 1 million patients or more being on compounded GLP-1 obesity the U.S. market***.

126. Knudsen's admission confirmed that the massive "wind-down" of competition Defendants had promised investors would occur in May did not happen, leaving Novo's prior growth estimates without any reasonable basis.

127. Following Knudsen's remarks, Defendant Moore provided additional detail regarding the specific impact of compounding and competition on Novo's core diabetes product, Ozempic:

<A: David S. Moore> … Yes, in regards to your question about Ozempic, we are seeing a flattish TRx development currently. We're seeing approximately 690,000 TRxs per week on par with competition. But the current competitive dynamics, we see we're capturing about 40% of the NBRx, and we do see patients switching from Ozempic to the competitor product as well. We haven't seen a solid pickup from our newly approved indication in chronic kidney disease, although we do hear positive comments from clinicians. We haven't seen that materialize into prescriptions as of yet.

And then secondly, we continue to see slower class growth of GLP-1 diabetes. ***And to some degree, there is also an impact from compounding, meaning if someone is coming in and looking for Ozempic branded product, it is possible that they would end up on a compounded semaglutide.***

57

128.  During the July 29, 2025 Investor Call, Knudsen, elaborating on his prior comments, admitted that he and the Individual Defendants were personally "working with regulators" such as the states' boards of pharmacy, to try and limit compounding:

> <A: Karsten Munk Knudsen> Yes. So just adding on to my prior comments on compounded GLP-1s in the U.S. marketplace, it's important that this is something we don't take lightly. It's a key safety concern. And of course, **we are active on many, many fronts** in [indiscernible] improving patient safety and using compounding to what is legally allowed. So **we** -- and most other things **are active in litigations and we're working with regulators**. And of course, we are hopeful that this can, over time, lead to a reduction in compounding and hence, a potential inflow of additional patients into the branded segments.

129.  Defendants' commentary on the July 29, 2025 Investor Call revealed to investors that Defendants' earlier forecasts did not have a reasonable basis when made. The Individual Defendants' aforementioned revelations are in direct contrast to the false statements they made during the Class Period in which Defendants continually expressed strong confidence in their guided growth for the second half of 2025, while misleadingly minimizing: (1) the threat that compounded semaglutide posed to Novo's business; (2) the significance of the personalization exemption for semaglutide compounding; and (3) the corresponding likelihood that compounders would continue making semaglutide even after the shortage.

130.    Indeed, analysts believed Novo's earlier assurances that compounding would be greatly diminished after the grace period ended, as demonstrated by a question from Barclays analyst Emily Field during the July 29, 2025 Investor Call:

<Q: Emily Field – Barclays Bank PLC – Head of European Union Pharmaceuticals Equity Research> Given that we're off the drug shortage list, *we all expected compounding to come down following this May 22 grace period date*. So I guess I sort of was wondering what is within the company's purview to get more aggressive in getting this to stop and defend your [IP] and defend your product?

131.    Investors and analysts reacted immediately to Novo's revelation that compounding pharmacies would continue to take market share of the GLP-1 drug market and that as a result, Novo's full-year financial results would be negatively impacted. The price of Novo's ADRs declined dramatically from a closing price of $69.00 per share on July 28, 2025 to $53.94 per share on July 29, 2025, a decline of 21.83% in the span of just a single day on heavy trading volume.

132.    A number of analysts who had been following Novo lowered their price targets in response to Novo's disclosures. For example, on July 30, 2025, Barclays reduced its price target by 46%, while noting "mounting concerns around the longer-than-expected issue of compounded GLP-1s (which seem to be impacting semaglutide disproportionately)[.]" Similarly, CFRA reduced its price target by 1/3, highlighting that "Novo cut guidance for the second time this year as compounded GLP-1s and competition continue to hurt sales."

59

133. The fact that this analyst, and others, discussed Novo's shortfall, guidance cuts, and below-expectation projections suggests the public placed significant weight on Novo's prior claims and estimates of sales and profit growth. The frequent, in-depth discussion of Novo's guidance confirms that Defendants' statements during the Class Period were material.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

134. The facts alleged herein support a strong inference that Defendants knew or recklessly disregarded that the statements set forth above were materially false and misleading when made. The facts outlined below reinforce a strong inference of scienter as to each Individual Defendant. Further, the Individual Defendants' scienter, and that of other senior executives, are properly imputed to Novo.

### A. Defendants' Private Communications with States' Boards of Pharmacy Create a Strong Inference that They Knew Compounding Pharmacies Intended to, and Could, Lawfully Sell Semaglutide "En Masse" Under the Personalization Exemption

135. Internal documents produced in response to Plaintiffs' public records requests to various state regulatory agencies revealed that at the time of Defendants' misstatements, senior Novo executives had contacted state regulators seeking enforcement action against compounders to prevent mass-compounding under the personalization exemption. Those communications included:

60

- June 28, 2024 letters from Robert B. Clark, Novo's Vice President of Regulatory Affairs to California's Department of Consumer Affairs, Board of Pharmacy, South Carolina's State Board of Pharmacy, and Michigan's State Board of Pharmacy requesting that the state regulators "Take Actions Regarding Compounded 'Semaglutide' To Support Patient and Prescription Drug Safety" and raising concerns that "Novo Nordisk has seen several entities sell compounded 'semaglutide' in combination with other ingredients or in other dosage forms[,]" which are hallmarks of drugs compounded under the personalization exemption.

- A March 20, 2025 letter from Robert B. Clark, Novo's Vice President of Regulatory Affairs to California's Department of Consumer Affairs, Board of Pharmacy attacking compounders' use of the personalization exemption, claiming that "[c]ompounders attempt to justify their compounding of 'semaglutide' products based on supposed clinical needs of patients. . . . However, in those cases where a prescriber determines that a patient needs another drug to complement their therapy, such as vitamin B-6 or B-12, the patient could easily be separately prescribed that vitamin B-6 or B-12 medication alongside an FDA-approved semaglutide medicine, rather than be prescribed an unapproved compounded 'semaglutide' product in which the 'semaglutide' is mixed with vitamin B-6 or B-12."

- An April 23, 2025 email from Novo's outside legal counsel to Michigan State Administrative Manager Kerry Przybylo to "Request to Submit Supportive Comment for Novo Nordisk Citizen Petition and End of Semaglutide Injection Shortage," noting that "[d]espite the limited enforcement discretion periods announced by FDA, *we are concerned that some compounders still plan to produce so-called "personalized" drugs claiming to contain semaglutide…We also are concerned that some telehealth companies may continue to partner with state-licensed compounders to sell such drugs en masse nationwide.*"

- An April 23, 2025 letter from Clark and Brett to the Michigan State Board of Pharmacy to "Request to Take Actions Against Compounded 'Semaglutide' to Protect Patients and Ensure Timely Compliance with Applicable Laws" stating "[n]otwithstanding the upcoming conclusion of the enforcement discretion period, *some compounding pharmacies appear poised to continue to engage in large-scale compounding of 'semaglutide'* using a pretextual *'personalization' strategy* to effectively circumvent the statutory restrictions in section 503A on compounding copies and related state laws."

61

- An April 23, 2025 email from Novo's outside legal counsel to South Carolina State Board of Pharmacy Executive Kayce Shealy attaching a draft statement Novo wanted the South Carolina Board to submit to the FDA expressing support for Novo's nomination of semaglutide to the Difficult to Compound List that noted "[w]e are concerned that the resolution of the Ozempic® and Wegovy® shortages may encourage unnecessary compounding of semaglutide products that differ from the FDA-approved medicines under the pretext of 'personalization.'"

- An April 30, 2025 email from Dohm to California State Board of Pharmacy Executive Officer Anne Sodergren following up on Novo's previous request for regulatory action against compounders arguing that "[c]ompounders cannot rely on mere pretextual differences between compounded drugs and FDA-approved medicines as a means to avoid the copies restriction in the FDCA. Pretextual compounding under the guise of 'personalization' poses acute and direct safety risks for patients, especially since semaglutide is a complex peptide that is difficult to compound."

- A May 29, 2025 letter from Clark and Brett to the California State Board of Pharmacy requesting that the Board take action against compounders "engaging in mass compounding of one-size-fits-all semaglutide products under the guise of personalization[,]" arguing "Mass Compounding of Semaglutide Drugs through the Guise of 'Personalization' is Prohibited under Section 503A[,]" and the FDA guidance of what constitutes an essential copy "misinterprets [Section 503A's] statutory standard and should be revised or withdrawn."

136. These letters and emails show that, contrary to Defendants' misstatements that compounded semaglutide would be, and was, "illegal" and "rare" after the shortage ended, Defendants knew, internally, the opposite was true and that compounding pharmacies lawfully could, and were continuing to, offer personalized versions of semaglutide drugs "en masse" under the legitimate FDA exemption provided by Section 503A.

137.    Indeed, Defendant Knudsen admitted in a May 7, 2025 *Bloomberg TV* interview that "we intend to work with the regulators to enforce that so that unsafe unlawful compounding will cease," and in the July 29, 2025 Investor Call that "***we're working with regulators***" to limit compounding. Thus, Defendants admit they were aware of—and it is reasonable to infer, directed—Novo's communications with states' pharmacy boards and the FDA.

138.    Further, Novo's May 29, 2025 letter to the California State Board of Pharmacy argued that "Mass Compounding of Semaglutide Drugs through the Guise of 'Personalization' is Prohibited under Section 503A[,]" but in doing so, claimed that the FDA's own guidance of what constitutes an essential copy of an FDA-approved drug "misinterprets [Section 503A's] statutory standard and should be revised or withdrawn." This shows that Novo recognized its June 23, 2025 public statement that "mass personalization" was illegal was inconsistent with existing FDA Guidance.

139.    Accordingly, Novo's failed attempts to shut down pharmacies that were engaged in compounding under the personalization exemption by seeking support from state regulators supports a strong inference of scienter because they demonstrate that prior to telling investors that compounding would be "illegal" after the shortage except in "rare circumstances," and that "mass personalization" was illegal, Novo was aware not only that compounders had a legal avenue to compound

63

semaglutide unrelated to the shortage, but also that they were doing so, and could continue doing so, "en masse," and, therefore, not just in "rare circumstances."

140. Plaintiffs have issued records requests to other state boards of pharmacy that have yet to be answered but may provide further support that Defendants' false and misleading statements were made with scienter.

**B. While Publicly Maintaining Compounders Do Not Threaten Novo's Business, Defendants Directed an Effort to Sue More than 100 Compounders Alleging Trademark Infringement to Stop Them from Taking Novo's Business**

141. Defendants' myriad lawsuits against compounding pharmacies support a strong inference of scienter, as they show that, contrary to their false and misleading statements that Novo did not "see [compounders] as a real threat" and that compounding was "not something that's impacting" Novo's business, Defendants believed an aggressive litigation campaign on a scale unprecedented for the Company was necessary to halt compounders' capture of market share of the GLP-1 drug market.

142. Between June 2023 and the start of the Class Period (*i.e.*, Defendants' first false and misleading statement), Defendants brought lawsuits against *fifty* compounding pharmacies alleging trademark infringement.

143. The allegations set forth in these lawsuits reflect Defendants' understanding that, contrary to their misstatements, compounders posed a ***direct*** threat to Novo's business. For instance, in *Novo Nordisk A/S v. Advanced Vitology*

64

*HRT, LLC*, filed on October 11, 2024, right before the start of the Class Period, Novo claimed that the defendant compounder made false and misleading statements to "***attract customers*** and generate revenues and profits, including by passing off its Unapproved Compounded Drugs purporting to contain 'semaglutide' as the Ozempic® and Wegovy® medicines or authorized variations of those medicines."[7] Defendants made virtually identical claims against a litany of other compounding pharmacies throughout Novo's litigation campaign.[8]

144.    Further, in a September 2023 filing in *Novo Nordisk Inc. v. Brooksville Pharmaceuticals Inc.*, an action based on the Florida Deceptive and Unfair Trade Practices Act, Novo explicitly described the threat compounders posed to the Company, claiming that "[a] reasonable inference from Novo's allegations is that it has lost and is losing goodwill and/or sales" because of the defendant pharmacy.[9]

145.    Taken together, the virtually uniform claims that compounding pharmacies were attracting customers away from Novo's branded drugs, and consequently harming Novo's sales of those drugs, along with the sheer scale in

---

[7] *Nordisk A/S v. Advanced Vitology HRT, LLC*, 1:24-cv-583, ECF No. 1, at *9 (S.D. Ohio Oct. 11, 2024) (emphasis added).

[8] *See e.g. Novo Nordisk Inc. v. Viva Aesthetics, LLC*, 8:24-cv-2293, ECF No. 1, at *10 (M.D. Fla. Sept. 30, 2024); *Novo Nordisk A/S v. Face Forward Aesthetics LLC*, 2:24-cv-3933, ECF No. 1, at *13 (S.D. Ohio Sept. 11, 2024); *Novo Nordisk A/S v. Milagros Family Healthcare LLC*, 4:24-cv-447, ECF No. 1, at *14 (D. Ariz. Sept. 9, 2024); *Novo Nordisk A/S v. Passarelli Grp. Inc.*, 2:24-cv-2361, ECF No. 1, at *10 (D. Ariz. Sept. 6, 2024); *Novo Nordisk A/S v. RLT Weight Loss LLC*, 2:24-cv-3753, ECF No. 1, at *9 (E.D. Pa. Aug. 2, 2024).

[9] *Novo Nordisk Inc. v. Brooksville Pharmaceuticals Inc.*, 8:23-cv-1503, ECF No. 26, at *13 (M.D. Fla. Sept. 15, 2023).

which Novo went after the compounding industry, show that Novo clearly viewed compounded semaglutide as a significant threat.

146. However, because the lawsuits were brought as trademark infringement actions, Novo's concerns and motives relating to compounding pharmacies were not apparent to investors.

**C. That the FDA Refused to Take Action to Prohibit Production of Compounded Semaglutide Under the Personalization Exemption Supports a Strong Inference Defendants Knew Compounding Was Harming, and Would Continue to Harm, Novo's Business**

147. Novo's efforts to discredit the safety and efficacy of compounded semaglutide support a strong inference of scienter not only because they demonstrate that Defendants viewed compounded semaglutide as a threat, but also because Defendants were aware that, despite those efforts, the FDA refused to take enforcement action against compounding pharmacies for producing drugs under the personalization exemption of Section 503A.

148. In October 2024, Novo sponsored a study titled, "Impact of Manufacturing Process and Compounding on Properties and Qualities of Follow-On GLP-1 Polypeptide Drugs." All authors of the study were employees and shareholders of Novo.

149. The study attempted to highlight impurities and potential stability issues that exist in semaglutide follow-on drugs, including compounded semaglutide. It concluded that "[t]he impact . . . on efficacy and safety outcomes remains unknown

66

and should be investigated by clinical studies." It also "urge[d] regulators to ensure that a robust assessment of any differences between originator and follow-on products is required[.]"

150.   Novo further tried to bring compounded semaglutide to the FDA's attention by responding on October 22, 2024 to the FDA's notice that it was developing a list of drug products that present demonstrable difficulties for compounding. Novo nominated semaglutide for, and requested, that the FDA issue a direct final rule adding it to, the Difficult to Compound List. On November 13, 2024, Novo sent a formal citizen petition to the FDA requesting that the FDA add semaglutide to the Difficult to Compound List.

151.   According to Section 503A(b)(3)(A), to compound a drug under the personalization exemption, it must not be identified as "a drug product that presents demonstrable difficulties for compounding that reasonably demonstrate an adverse effect on the safety or effectiveness of that drug product[.]" A drug placed on the Difficult to Compound List would therefore prohibit companies from compounding it under the personalization exemption of Section 503A.

152.   Novo's efforts to place semaglutide on the Difficult to Compound List are ongoing. On May 7, 2025, the FDA informed Novo that it was still reviewing Novo's nomination and request for a final rule.

153.   Novo's publication and sponsorship of a study attempting to discredit the efficacy of compounded semaglutide, and its efforts to place semaglutide on the Difficult to Compound List, raise a strong inference that, contrary to their misstatements, Defendants knew compounded semaglutide was harming, and would continue to harm, its business.

154.   Further, to the extent the FDA did send warning letters regarding compounded semaglutide to pharmacies prior to Defendants' misstatements, its warnings related to violations regarding marketing and branding of compounded semaglutide, not to the legality of personalized compounded semaglutide.[10]

155.   Novo's pursuit of the "Difficult to Compound" designation was a desperate attempt to legislatively or regulatorily close a door that Defendants were simultaneously telling investors was already locked. This regulatory maneuvering exposes that Defendants were fully aware that the personalization exemption was a valid, durable legal pathway for competitors. Their attempt to change the law was a silent acknowledgement that their public "wind-down" narrative was a fabrication.

**D. Defendants' Launch of NovoCare, a Pharmacy to Compete with the Lower Pricing of Compounders, Contributes to the Scienter Inference**

156.   Novo typically sells the drugs it manufactures to wholesalers, who in turn supply them to pharmacies. However, on March 5, 2025, Novo announced its

---

[10]   *See, e.g.,* FDA Amended Warning Letter to ProRX, LLC (March 4, 2025), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/prorx-llc-696742-03042025.

launch of NovoCare Pharmacy ("NovoCare"), a direct-to-patient delivery option that allows patients who are uninsured or have commercial insurance not covering Wegovy or Ozempic to purchase these weight loss drugs directly from Novo.

157. In its statement promoting NovoCare, Novo discredited the safety and efficacy of compounded semaglutide, stating that "NovoCare Pharmacy offers patients access to authentic, FDA-approved Wegovy, helping to avoid the significant risks that can be posed by the compounding marketplace[.]" It went on to state that "healthcare professionals and patients can have clarity and confidence in knowing the medicine they are using has undergone rigorous review for safety, effectiveness, and quality."

158. Novo's decision to compete directly with telehealth providers of compounded semaglutide through NovoCare, and its statement discrediting compounded semaglutide in its announcement, raise a strong inference that, contrary to their misstatements, Defendants knew compounded semaglutide would be legal and available other than just in "rare" circumstances. Specifically, it demonstrates that Defendants recognized the need to co-opt the methods telehealth companies used to promote compounded semaglutide, as they realized the Company would have to continue competing with compounded semaglutide even after the shortage ended.

159. Thus, Defendants' understanding of the market and demand for compounded semaglutide via the personalization exemption is underscored by Novo's ongoing direct competition with semaglutide compounders since entering the direct-to-patient market in March 2025.

**E. Defendant Jørgensen's Suspiciously Timed Termination Further Supports a Strong Inference of Scienter**

160. On May 16, 2025, after Jørgensen had spent months misleading investors about the threat compounding posed to Novo's business, the Company announced that he would "step down" from his role as CEO after an indefinite transition period during which time the Company would search for and select a new CEO. The announcement claimed that Jørgensen's planned departure was "per mutual agreement," but a *Reuters* article published that same day reported that Jørgensen said in an interview "that he did not see the decision coming, and was only informed very recently."

161. Then, on July 29, 2025, the same day that the market learned the truth regarding Defendants' false and misleading statements, Novo announced that Maziar Mike Doustdar had been appointed as president and CEO and Jørgensen would "step down" from that role, effective August 7, 2025.

162. Jørgensen's exit is directly tethered to the fraud alleged herein and the revelation of that fraud. Throughout the Class Period, Jørgensen served as the primary, public face of Novo's false narrative, affirmatively assuring investors on

70

multiple occasions that compounding pharmacies were "not something that's impacting our business as of today" and that they were not "a real threat." His departure, announced concurrently with the collapse of that narrative and a devastating 21.83% drop in the price of Novo ADRs, strongly supports the inference that he knew, or at minimum, recklessly disregarded, that his prior public assurances were materially false when made.

163.    Courts routinely recognize that the suspiciously timed termination of a key corporate officer—especially a CEO—contributes to a strong inference of scienter when viewed in the totality of the circumstances. Here, Jørgensen's departure is contextualized by the Company's massive, contemporaneous litigation campaign against compounders, granular letters sent by senior executives to state boards of pharmacy, and the launch of a direct-to-patient pharmacy, all of which confirm top executives knew compounded semaglutide was eroding Novo's market share. Jørgensen's exit as the truth emerged is the ultimate hallmark of a corporate executive being held accountable for misleading the investing public.

F.  **The Actions of Novo's Agents and Senior Executives Contribute to the Scienter Inference**

164.    Throughout the Class Period, Defendants' agent, Covington, repeatedly communicated with state regulatory bodies on behalf of the Company.

165.    For example, on June 28, 2024, Julie Dohm ("Dohm"), a partner at Covington, sent emails "on behalf of Novo Nordisk" to Anne Sodergren, Executive

71

Director of the California State Board of Pharmacy ("CSBP"). The sole purpose of that communication was to urge CSBP to take action relating to "compounded drugs purporting to contain semaglutide." That same day, Dohm sent substantially identical communications to Andria Distchman, Departmental Specialist at the Michigan State Board of Pharmacy, again on behalf of Novo.

166. Covington's efforts against compounded semaglutide on behalf of Novo continued throughout the Class Period. Dohm sent additional communications to the South Carolina, Michigan, and California regulatory boards on April 23, 2025, April 30, 2025, and May 29, 2025. Each communication was on behalf of Novo and was designed to motivate regulators to take any action possible against pharmacies that compounded semaglutide drugs under the Section 503A personalization exemption.

167. In addition to the communications by Novo's agents at Covington, the Company's own senior executives sent similar communications to state regulators. For example, Kelsey Lovell, Novo's Associate Director of Policy, sent a January 27, 2025 letter to California's Department of Consumer Affairs, Board of Pharmacy, advocating for greater restrictions to be placed on compounding under the personalization exemption. The high-level Novo executives that communicated with state regulators throughout the Class period also included Robert B. Clark, Vice

72

President, Regulatory Affairs, and Jason Brett, Principal Medical Head, Medical Affairs.

168.  The acts and knowledge of Novo's agents and senior executives who acted on behalf of the Defendants, and who sought to influence state regulators' actions regarding the adoption and enforcement of rules governing the personalization exemption, contribute to an inference that the Defendants knew that their statements were false when made.

169.  Further, the aforementioned acts and knowledge of Novo's agents and senior executives are imputed to Novo.

## G.  GLP-1 Drug Sales Were Novo's Core Operations

170.  Defendants were aware that their misstatements regarding compounded semaglutide were false and misleading because compounded semaglutide directly competed with Novo's branded GLP-1 drugs, which were the core of the Company's business.

171.  As explained in §IV.A., Novo's Diabetes and Obesity care segment accounted for over 90% of the Company's revenues in both 2024 and 2025. Further, the United States was Novo's biggest and most important geographic market segment, accounting for over one half of Novo's annual sales in both 2024 and 2025. Wegovy and Ozempic, Novo's two main branded semaglutide drugs, together accounted for 61.5% and 66.7% of Novo's total revenues in 2024 and 2025

73

respectively. Within the U.S. market, those drugs accounted for 77.6% and 80.5% of Novo's revenues in 2024 and 2025, respectively. Accordingly, it is undeniable that Novo's branded semaglutide drugs were the Company's core operation.

172.  Further, Novo reported on its GLP-1 drug sales and its market share gains every quarter. Novo specifically attributed its positive sales numbers to its GLP-1 drugs. For instance, during the Company's November 6, 2024 earnings call, Novo highlighted that "[s]ales in North America were driven by a prescription volume growth of the GLP-1 class[.]"

173.  That GLP-1 drugs were Novo's core operation during the Class Period, and that compounded semaglutide directly competed with Novo's core operation, support a strong inference of scienter as they indicate that Defendants were aware of the true extent to which competition from compound semaglutide threatened and was already materially affecting Novo's business through the loss of 20% of its market share. Accordingly, Defendants knew their misstatements that Novo did not "see [compounders] as a real threat" and compounding was "not something that's impacting" Novo's business were false and misleading when made.

## VIII.  LOSS CAUSATION AND ECONOMIC LOSS

174. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions that artificially inflated the prices of Novo ADRs and operated as a fraud or deceit on Class Period purchasers

74

of Novo ADRs by materially misleading the investing public. Later, when Defendants' prior misrepresentations became apparent to the market, the price of Novo ADRs materially declined, as the prior artificial inflation came out of the price. As a result of their purchases of Novo ADRs during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

175. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. Defendants' material misstatements and/or omissions created in the market an unrealistically positive assessment of Novo's business, market position, and prospects, thus causing Novo ADRs to be overvalued and artificially inflated at all relevant times. By misleading investors about the negative financial impact and continuing threat compounding pharmacies had on Novo's business, and by not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of Novo's business and current and future financial prospects.

176. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Novo ADRs declined significantly.

177.   On July 29, 2025, Novo announced it had "lowered sales and operating profit outlook for 2025," each by at least 35% at the midpoint of the guidance range issued in May 2025, just two months prior.

178.   Defendants attributed the lower guidance to "lowered growth expectations for the second half of 2025" "related to lower growth expectations for Wegovy in the U.S. obesity market lower growth expectation for Ozempic in the U.S. GLP-1 market as well as lower-than-expected penetration for Wegovy in select IO markets."

179.   Defendants elaborated that the "lower growth expectation for Wegovy in the U.S. obesity market reflects the persistent use of compounded GLP-1 along with slower market expansion and competition." Defendants finally acknowledged that "mass compounding has continued, and that multiple providers continue to market and sell compounded GLP-1s" under the personalization exemption.

180.   With respect to Wegovy, Defendants stated that the "sales outlook also reflects lower-than-expected penetration of Wegovy in the insured channel. This is due to lower market expansion and competitive dynamics despite the initiation of new commercial activities for Wegovy in the first half of 2025."

181.   These disclosures corrected Defendants' prior misstatements that, among others, compounding was not "a real threat" because "after May 22nd compounding in a mass way is deemed illegal by FDA, except for rare circumstances"

76

where "it's illegal to do compounding. So that has to stop, and that creates the opportunity for us to drive a bigger growth" and investors would, thus, "see this guidance as one of us really stepping up in the second half of the year[.]"

182.   Upon this news, the price of Novo's ADRs declined from $69.00 per ADR on July 28, 2025 to $53.94 per ADR on July 29, 2025, a 21.83% decline on high trading volume.

183.   Analysts understood Defendants' disclosures as revealing that compounding pharmacies had permanently taken market share from Novo because they actually were, and would continue to, be a threat to Novo's business. For example, on July 30, 2025, Barclays issued a report entitled "Compounding concerns too difficult to ignore," downgrading Novo to Equal Weight, stating "many of the issues called out yesterday in Novo's guidance reduction seem company-specific, and we did not come away from the call with a clear line of sight as to how and when many of these issues may resolve[.]" Barclays explained that its downgrade was "reflecting mounting concerns around the longer-than-expected issue of compounded GLP-1s (which seem to be impacting semaglutide disproportionately)[.]"

184.   On July 29, 2025, Deutsche Bank issued a report titled "Long road back? We'll have answers soon enough. Q2 prerelease call takes[,]" stating:

> The main ***new information*** today ***was disclosure that Novo believes total compound supply has not declined at all since May and implicitly***

77

*will not improve much in Q2*, with around 1m US patients still on compound drug (as 503A supply has increased to offset a decline in 503B…).

185. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class was a direct result of Defendants' false statements that artificially inflated, or maintained the artificial inflation in the price of Novo ADRs and the subsequent significant declines in the value of Novo ADRs when Defendants' prior misrepresentations were disclosed.

186. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Novo ADRs at artificially inflated prices, thus causing the damages complained of herein.

## IX.  PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

187. At all relevant times, the market for Novo ADRs was an efficient market for the following reasons, among others:

(a)  Novo ADRs met the requirements for listing and were listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)  Novo communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

(c)     Novo was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Novo was reflected in and incorporated into the Company's ADR price during the Class Period.

188.    As a result of the foregoing, the market for Novo ADRs promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Novo ADRs. Under these circumstances, all purchasers of Novo ADRs during the Class Period suffered similar injury through their purchase of Novo ADRs at artificially inflated prices, and a presumption of reliance applies.

189.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor

might have considered the omitted information important in deciding whether to buy or sell the subject security.

## X.   NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

190.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they misled investors about the material, negative impact and continued competitive threat of compounding pharmacies on Novo's business and issued unsupported financial forecasts.

191.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

192.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Novo who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants

80

were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XI.    CLASS ACTION ALLEGATIONS

193.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Novo ADRs during the Class Period; and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

194.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Novo ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

Record owners and other members of the Class may be identified from records maintained by Novo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of December 31, 2024, Novo had 3,390,128,000 B shares outstanding, which were represented by the ADRs that traded on the NYSE under the symbol NVO. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

195. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that is complained of herein.

196. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

197. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

82

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Novo;

(c)    whether the Individual Defendants caused Novo to issue false and misleading statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)    whether the prices of Novo ADRs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

198.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF

### COUNT I

### *Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder*

199.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

200.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

201.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Novo ADRs; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Novo's securities at

84

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

202.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Novo's ADRs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

203.   By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

85

204. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or officers of the Company, the Individual Defendants had knowledge of the details of Novo's internal affairs.

205. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Novo's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of Novo's ADRs were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company that were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Novo's ADRs at artificially inflated prices and relied upon the prices of the ADRs, the integrity of the market for the ADRs and/or statements disseminated by Defendants, and were damaged thereby.

206. During the Class Period, Novo's ADRs were traded in an active and efficient market. Plaintiffs and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Novo ADRs at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADRs, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true values of Novo ADRs were substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Novo ADRs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

207.   By reason of the conduct alleged herein, Defendants have knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

208.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Novo ADRs during the Class Period, upon the disclosure that the Defendants had been disseminating false and misleading statements to the investing public.

87

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

209. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

210. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Novo's misstatements.

211. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Novo that had become materially false or misleading.

212. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, statements, press releases and public filings that Novo disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Novo to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "control persons" of the Company within the meaning

88

of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Novo's ADRs.

213. Each of the Individual Defendants, therefore, acted as a control person of the Company. By reason of their positions as officers, senior managers, and/or directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Novo to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

214. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XIII.   PRAYER FOR RELIEF

Wherefore, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## XIV.    DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 3, 2026                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (330152020)
Shannon L. Hopkins (*pro hac vice*)
Gregory M. Potrepka (*pro hac vice*)
David C. Jaynes*
Joshua E. Kluger (533402025)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: djaynes@zlk.com
Email: jkluger@zlk.com

*Attorneys for Lead Plaintiff Ahmed Hashim*

90

**ROBBINS GELLER RUDMAN & DOWD LLP**

Samuel H. Rudman*
Alan I. Ellman *
Jason Edelman*
58 South Service Road, Suite 200
Melville, NY 11747
Tel.: (631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com
Email: aellman@rgrdlaw.com
Email: jedelman@rgrdlaw.com


**LMN LAW GROUP**

Paul Newcomer*
195 W. Nine Mile Rd. Ste. 212
Ferndale, MI 48220
Tel.: (248) 721-6801
Email: pmn@lmnlawgroup.com

*Attorneys for Additional Plaintiff IAM Motor City Pension Fund*

* *Pro Hac Vice* applications for counsel not already admitted in the District of New Jersey will be filed after the Amended Complaint is filed.

91

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of April, 2026, a copy of the foregoing Notice of Appearance was filed vie the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

/s/ Adam M. Apton
Adam M. Apton

Dated: April 3, 2026

92